# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

EDITH ZANDERS,               )
                             )
    Plaintiff,              )
                             )
v.                           )        Case No. CV412-182
                             )
CAROLYN W. COLVIN,           )
*Commissioner of Social Security*,[1] )
                             )
    Defendant.              )

# REPORT AND RECOMMENDATION

On January 14, 2010, Edith Zanders applied for a period of disability and supplemental security income benefits. (Tr. 22, 196.) She was 58 years old at the time. (Tr. 22, 41.) She claimed that she could not return to work as a child placement specialist due to back pain and depression. (Tr. 196.) Her application was denied both initially and on review. (Tr. 77-80; tr. 85-92.) An Administrative Law Judge ("ALJ") conducted a hearing on August 18, 2011, and entered an order denying

---

[1] While plaintiff named Michael J. Astrue as the Commissioner of Social Security, he has since been replaced with Carolyn W. Colvin. Accordingly, the Clerk is **DIRECTED** to correct the docket, and all future filings shall conform.

Zanders' benefits application on August 25.  (Tr. 35-69 (hearing); tr. 17-34 (order)).  The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  She then filed a complaint for judicial review in this Court, contending that the ALJ erred in reaching his decision.  (Doc. 1.)

## I.  STANDARD OF REVIEW

Affirmance of the ALJ's decision is mandatory if his conclusions are supported by substantial evidence and based upon an application of correct legal standards.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is something more than a mere scintilla, but less than a preponderance."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted).  It "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted).  If substantial evidence supports the decision, the Court will affirm "[e]ven if the evidence preponderates against the Commissioner's findings."  *Id.* at 1158-1159.  This Court cannot substitute its judgment

for that of the Commissioner. *Barnes v. Sullivan*, 932 F.2d 1356, 1357-1358 (11th Cir. 1991).

The burden of proving disability lies with the claimant. 20 C.F.R. § 404.1512; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To determine whether she has met her burden, the Court looks to the five-step evaluation process set forth in the Social Security Regulations. 20 C.F.R. § 416.920; *Dixon v. Astrue*, 312 F. App'x 227, 227-28 (11th Cir. 2009); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). At step one, the claimant must prove that she has not engaged in substantial gainful activity. *Jones*, 190 F.3d at 1228. At step two, she must demonstrate a severe impairment or combination of impairments. *Id.* Then, at step three, if the claimant's impairment meets or equals a listed impairment, she is automatically found disabled. *Id.* If not, she must advance to step four, which requires her to prove an inability to perform past relevant work. *Id.* If she cannot perform past relevant work, stage five shifts the burden to the Commissioner to show that "there is other work available in significant numbers in the national economy that the claimant is able to perform." *Id.*

## II.   ANALYSIS

Zanders is a well-educated woman.[2]  She has 63 hours of college credit in early childhood education, and she has worked in skilled and semi-skilled jobs for some time.  (Tr. 40; tr. 61.)  She worked as a Pre-K teacher for many years, but she injured her back in 1999 while lifting children. (Tr. 22, 43, 45-46, 195-96.)   Because of the injury, she eventually changed careers.  She last worked as a placement specialist in South Florida.  (Tr. 43, 180, 195.)  That job entailed finding homes for children who had been taken away from their parents and placed into state custody.  (Tr. 43.)  She quit in July 2009 because of worsening back pain and stress.  (Tr. 43, 196.)  She reports that her back still causes her severe pain, and X-rays confirm that she has minor degenerative disc disease in her lumbar spine.   (Tr. 23, 370.)   The medical evidence supporting her mental impairments is not nearly as strong, however.[3] Her general practitioner diagnosed her with depression in 2008, after her

---

[2] She is not grossly overweight, however, for the record reflects that she stands five feet, three inches tall, and weighs 255 pounds.  (Tr. 396.)

[3] Not that the existence or non-existence of mental illnesses can ever be proven with exactitude.  Courts have frequently recognized that "a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment."  *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989).

mother passed away, and she reported to a consulting psychologist, Dr. Kristiansson Roth, Ph.D., that it worsened after her sister died in September 2009, a few months after she quit her job. (Tr. 334-35.)

The ALJ did not find Zanders to be credible. After reviewing the medical record and evaluating the testimony offered at the hearing, he found, at step four of the five-step analysis,[4] that she retained the ability

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she has the ability to lift and carry 10 pounds frequently and 20 pounds occasionally, sit up to two hours at one time without interruption, and stand/walk four to six hours during an eight hour workday with normal breaks. She has no limitations in her ability to perform repetitive, short cycle work with a specific vocational profile of SVP1-4. She has some limitations in her ability to perform complex work, but she is able to perform this work satisfactorily.

(Tr. 24.) In the end, he determined that her residual functional capacity ("RFC") permitted her to return to her work as a placement specialist.[5]

---

[4] He found at step one that claimant had not engaged in any substantial gainful activity since June 11, 2009, though she had a modest income in 2010 from some self-employment earnings. (Tr. 22.) At step two, he found that her severe disabilities included degenerative disc disease of the lumbar spine and an affective disorder. (Tr. 22-23.) These impairments, however, did not meet a Listing (*see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (listings) at step three. (Tr. 23-24.)

[5] Residual functional capacity is what a claimant can do in a work setting despite any physical, mental, or environmental limitations caused by the claimant's impairment and its related symptoms. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). RFC includes physical abilities, such as standing, sitting, or walking, and mental abilities, such as understanding, carrying out instructions, or responding

(Tr. 28; tr. 43 (employment history).)  Hence, a finding of "not disabled" was directed without the need to move on to step five.  (Tr. 28.)

Plaintiff contends that her case must be remanded since the ALJ erred by: (1) finding she could return to her past work; (2) failing to properly weigh the medical evidence related to her mental impairments; (3) failing to properly evaluate her credibility; and (4) relying upon flawed vocational expert ("VE") testimony.  (Doc. 12 at 2.)  The Court will first address grounds two and three, which relate to her mental impairments, before moving on to grounds one and four.

## A.    Mental Impairments

Zanders' general practitioner diagnosed her with depression in 2008, not long after her mother died.[6]  (Tr. 335.)  He initially prescribed her Xanax, but it was later discontinued.  (*Id.*)  In the meantime, she continued her job as a placement specialist, finding homes for children who had to be taken from their parents, through June 11, 2009.  (Tr. 43, 161.)  She later reported to Dr. Roth, a consultative examiner in the

---

appropriately to supervision, co-workers, or work pressure.  *Id.* §§ 404.1545(b)-(c), 416.945(b)-(c).

[6] Notably, she's never formally sought any mental health treatment.  (Tr. 47.) It only came up with her general practitioner.

disability proceedings, that she experienced a "nervous breakdown" after her sister died in September 2009. (Tr. 334.) But there is no evidence of record suggesting that she sought any sort of counseling or mental health treatment in response. In 2010, however, her new general practitioner prescribed her Zoloft. (Tr. 402.) It is unclear how long she stayed on that medication, how well she responded to it, or how limiting her doctor believed the depression to be.

After quitting her job, she helped care for two of her sons who were confined to wheel chairs through March 2010. (Tr. 47.) She eventually lost her house and was forced to move in with one of her sons. (Tr. 41.) That arrangement didn't work out, so she left and moved in with another son, who lives near Savannah. (*Id.*) She's been babysitting his children for at least 25 hours per week in exchange for room and board ever since, though she insists that she doesn't spend much of that time actually interacting with the kids. (Tr. 41, 47.)

After filing for disability, Zanders saw Dr. Roth on March 15, 2010 for the consultative exam mentioned above. (Tr. 334.) She presented with a melancholy mood and reported suffering from a lack of energy, poor sleep patterns, and appetite disturbances. (*Id.*) She also reported

that she has not received any real mental health treatment in her past, was never hospitalized for emotional or mental problems, has no history of substance abuse, and has no suicidal thoughts. (Tr. 334-335.) Despite these problems, she managed her own money, cared for herself, cooked, did laundry, drove (though with some trepidation), and regularly texted and emailed her friends. (Tr. 335.)

Dr. Roth diagnosed Zanders with major depressive disorder. (Tr. 336.) As for her ability to work, the doctor found that Zanders could understand, remember, and follow simple work instructions without difficulty, though her ability to sustain focus and effort was restricted, and she was likely to decompensate under "normal levels of change, stress and expectations."[7] (*Id.*) Nevertheless, Dr. Roth opined that Zanders' "prognosis for a significant improvement over the next 12 months is considered fair." (*Id.*)

Dr. Ndiya Nkongho, Ph.D., a non-examining medical consultant who prepared a mental residual functional capacity assessment for

---

[7] According to the Listings, episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." See 20 CFR Part 404, Subpart P, App'x 1.

Zanders, concluded that Zanders' depressive symptoms would intermittently impair concentration and task persistence. (Tr. 340.) Nevertheless, she could get along with supervisors and co-workers and "would fare well in a low-stress working environment." (*Id.*) While the doctor opined that Zanders had mild restrictions in activities of daily living, and moderate restrictions in social functioning and maintaining concentration, persistence, or pace, she was not expected to experience *extended* episodes of decompensation, though she "could" decompensate under stress. (Tr. 352, 354.)

The ALJ found that claimant's depression caused more than minimal limitations on work-related activities and was thus "severe" under the applicable regulations at step two, though it didn't meet a step-three Listing since she had no marked restrictions in daily living, social functioning, concentration, persistence, or pace, or repeated episodes of extended decompensation.[8] (Tr. 23.) At step four, the ALJ found that Zanders was not entirely credible, and he afforded little weight to Dr. Roth's opinion in making his RFC assessment. (Tr. 25-27.)

---

[8] He applied the 12.00 Listings for adult mental disorders, including "Affective Disorders" under 12.04. (Tr. 24); 20 C.F.R. Pt. 404, Subpt. P, App'x 1.

Zanders takes issue with those determinations, but, as explained below, there is no well-supported medical evidence in the record suggesting that his findings were in any way suspect.[9] (Doc. 12.)

### i. *Credibility*

When a plaintiff attempts to establish disability through her own testimony concerning pain or other subjective symptoms, she "must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson,* 284 F.3d at 1225; *Hernandez v. Comm'r of Soc. Sec.,* 2013 WL 3722107 (11th Cir. July 17, 2013). "The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam). Nevertheless, "[a]fter considering a claimant's [subjective] complaints . . . , the ALJ may reject them as not

---

[9] Even plaintiff recognizes "that there is a dearth of evidence in this case." (Tr. 39.) It is apparent that her main plan of attack has been to force the Commissioner to prove that she is not disabled, entirely upending the burden of proof applicable in these proceedings.

creatable." *Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir. 1992) (per curiam).

Here, the ALJ believed that Zanders had held certain relevant facts back during her exam with Dr. Roth. (Tr. 27.) It particularly troubled him that she failed to tell Dr. Roth that she cared for her grandchildren. (*Id.*) While Zanders insisted at the hearing that she didn't do much to supervise the children, the ALJ did not believe her. The children were two and four years old, an age range where children require at least some interaction and supervision. (*Id.*; tr. 41.) He was also troubled by the fact that she had never sought out any mental health counseling or treatment; it had only come up in passing with her general practitioners. (Tr. 26.) And despite her depression and back pain, she still managed to maintain some level of activity, including driving a car, cooking, doing laundry, watching television, and spending time on the computer using Facebook. (Tr. 27-28.)

In a rather blatant attempt to reverse the burden of proof, she claims that the ALJ was required to accept her testimony as to her grandchildren absent evidence in the record suggesting that she lied. (Doc. 12 at 13-14.) As explained above, the ALJ is not required to accept

everything that he is told.  He may reject testimony that he finds to be incredible.  He was thus free to reject her assertion that she did little to no work monitoring the children for 25+ hours per week.  Next, she states that her ability to continue engaging in minimal daily activities shouldn't be determinative.  *Id.*  While daily activities may not be determinative on the issue of credibility they are certainly a factor to be considered.[10]  The regulations themselves *require* that they be considered.  *See* 20 C.F.R. § 404.1529(c)(3) (when evaluating credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the nature and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) effects of medications; and (5) treatment or measures taken by the claimant for relief of symptoms).  Here, Zanders' daily activities were one factor among many that the ALJ relied upon in reaching his decision.  So his reliance upon them, in part, was not error.

---

[10] Plaintiff's reliance on *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997), in challenging the ALJ's reliance upon her activities of daily living, is misplaced.  While the ability to do basic activities, standing alone, may not be enough to discredit a claimant, it is still a factor to be considered, and here that factor weighs against her subjective complaints.  As explained in *Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986), the ALJ should not rely solely on activities of daily living, but should view the record "as a whole."  Here, the record, as a whole, cuts against Zanders.

Finally, she claims that her failure to seek mental health treatment is not a fair basis for disbelieving her subjective complaints, since the ALJ never specifically asked the reasons why she failed to seek treatment.[11] (Doc. 12 at 13-14.) Even accepting that it would have been better for the ALJ to inquire further into Zanders' failure to seek mental health treatment, it wasn't the sole basis for his decision.[12] This is not a

---

[11] She also insists that the ALJ applied the wrong legal standard in assessing her credibility. (Doc. 12 at 13.) He stated that "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 25.) According to Zanders, this reverses the standard, since it suggests that the "claimant's functional capacity is determined first and the claimant's credibility is weighed against the capacity found." (Doc. 12 at 13.)

Zanders relies on several out-of-circuit cases criticizing the use of similar boilerplate, but in those cases there were several other problems with the structure of the ALJ's decision and obvious errors in the conclusions that he reached. (Doc. 12 at 12 (over-reading *Bjornson v. Astrue*, 671 F.3d 640, 645-646 (7th Cir. 2012). Here, the ALJ did not apply an incorrect legal standard. Rather than making the RFC finding first, as plaintiff suggests, the ALJ simply led with the result, then explained his reasons for reaching it. There is nothing wrong with addressing the standard using such an approach. *See Mendez v. Astrue*, 2012 WL 1493732 at *3 (M.D. Fla. Mar. 21, 2012) (noting that the "boilerplate" language appropriately addresses the Eleventh Circuit's credibility standard).

[12] Plaintiff lists only out-of-circuit cases for the premise that it is not acceptable to rely upon a lack of treatment as a basis for discounting a claimant's subjective complaints without at least asking her why she didn't seek treatment. *See e.g., Regennitter v. Comm'r of Soc. Sec'y*, 166 F.3d 1294, 1299-1300 (9th Cir. 1999) (criticizing the use of lack of mental health treatment as a basis for discounting a plaintiff's subjective complaints). Even if the ALJ erred, the Court is satisfied that the error is, at most, harmless. *E.g., Carson v. Comm'r of Soc. Sec. Admin.*, 300 F.

case where the ALJ played "gotcha" by raising lack of treatment but failing to give Zanders the opportunity to rebut it at the hearing. The record, when viewed as a whole, supports his determination that Zanders overstated the limitations resulting from her mental impairments.

### ii. *Weighing Medical Evidence*

Zanders next asserts that the ALJ improperly weighed the opinions of Doctors Roth and Nkongho in making his RFC assessment. (Doc. 12 at 8-12.)

In assessing RFC, the ALJ must state with particularity the weight given different medical opinions and the reasons for doing so. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (without this explanation, a reviewing court cannot determine whether the decision was supported by substantial evidence). The ALJ has wide latitude to determine what weight to assign to those opinions, so long as he operates within the

---

App'x 741, 746 n.3 (11th Cir. 2008) (applying harmless error analysis to social security appeals where the record does not indicate that a legal error "affected the ALJ's decision"); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (same); *see also Shinseki v. Sanders*, 556 U.S. 396, 407-12 (2009) (explaining harmless error in two Veterans Administration cases).

regulatory and judicial frameworks. For instance, when discounting a medical opinion, he should consider several factors, including the examining relationship, the treatment relationship, the doctor's specialization, whether the opinion is amply supported, and whether the opinion is consistent with the record. 20 C.F.R. §§ 404.1527(c), 416.927(c).

Zanders' entire case turns on the opinions of the state examiners, since she has proffered no evidence from a *treating* physician other than a brief scrawl from her general practitioner -- a doctor not trained in psychiatry or psychology -- noting that she was depressed and prescribing her medication. Dr. Roth was not a treating physician, despite her examination. Instead, she acted as a consulting, examining psychologist.[13] While her opinion is thus accorded more weight than that of a non-examining psychologist, it is by no means determinative.[14] For

---

[13] While she examined Zanders, she did not qualify as a treating physician. CAROLYN A. KUBITSCHEK & JON C. DUBIN, SOCIAL SECURITY DISABILITY LAW AND PROCEDURE § 2:26 (2013 ed.) (a physician is not a "treating" source when he has only examined the plaintiff once for a social security consultation).

[14] Generally, the opinions of examining physicians are given more weight than non-examining physicians, and treating physicians are given more weight than non-treating physicians. *See id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). An ALJ must give controlling weight to a treating physician's medical opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

15

that matter, Dr. Nkongho's opinion is due even less weight, as Nkongho never even examined Zanders.

Dr. Roth concluded that Zanders suffered from major depression and would be restricted in maintaining production standards and adherence to a normal work schedule. (Tr. 337.) The only foundations for the diagnosis and resulting limitations were Zanders herself, whom the ALJ had decided was not entirely trustworthy, and the brief diagnosis made by her primary care doctor some years before -- again, a doctor who was not trained in psychiatry. Dr. Roth lacked a true longitudinal perspective,[15] despite Zanders' insistence to the contrary. There was nothing in the family doctor's treatment notes for Dr. Roth to rely on. He never explained his reasons for the diagnosis, evaluated how she responded to medication, or laid out any of the limiting effects she now reports. *See Moore*, 405 F.3d at 1213 n.6 ("the mere existence of

---

inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Simone v. Comm'r of Soc. Sec.*, 465 F. App'x 905, 910 (11th Cir. 2012). If the ALJ gives less than controlling weight to the opinion of a *treating* physician, he must give specific reasons, and failure to state those reasons is reversible error. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Hence, he must clearly articulate reasons showing "good cause" for discounting it. *Id.*

[15] This is quite a normal position for consulting doctors. They "do not have the benefit of observing the patient's condition over a period of time." KUBITSCHEK, SOCIAL SECURITY DISABILITY LAW AND PROCEDURE § 2:27. They also have "only limited background information on the claimant." *Id.*

16

these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard"). Taken along with the ALJ's finding that Zanders had misrepresented by omission some key facts that may have altered Dr. Roth's opinion, the Court is satisfied that substantial evidence of record supports the ALJ's decision to give little weight to the doctor's opinion as to the limiting effects of plaintiff's depression.

Plaintiff also asserts that the ALJ omitted almost every limitation found by Dr. Nkongho in the Mental Residual Functional Capacity Assessment form. (Doc. 12 at 9.) The form she sites to, however, is merely a worksheet. POMS DI 24510.060(B)(2) (section I is "merely a worksheet," but section III contains "the **actual mental RFC assessment**"). The *actual* restrictions were listed in the following psychological review form, showing mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of extended decompensation. (Tr. 352.) The ALJ noted the existence of these restrictions, and gave them only "some" weight,

despite ultimately finding that plaintiff actually could complete some detailed work despite her limitations. (Tr. 28.)

## B. Past Relevant Work

Zanders makes much of the fact that the ALJ had limited her to a Specific Vocational Profile ("SVP") of 1-4 (unskilled work) based on her RFC, but her past work qualified as skilled and had an SVP of 7. Since she can only perform SVP 1-4 work, she reasons that she cannot return to work as a placement specialist. (Doc. 12 at 6.)

The argument completely misconstrues the ALJ's assessment. He never limited her to SVP 1-4. Instead, he found that she could perform SVP 1-4 jobs *without limitation*. (Tr. 24, 63.) That does not mean that she is limited to SVP 1-4 jobs. The ALJ also found that while she "has some limitations in her ability to perform complex work . . . she is still able to perform this work satisfactorily." (Tr. 24.) Since he found that she could perform detailed, complex tasks, she was not limited solely to unskilled work in the SVP 1-4 levels. (Tr. 24.) Instead, she could perform some skilled work, which corresponds to SVP 5-9.[16] SSR 00-4p,

---

[16] Skilled work is by definition complex work. SSR 83-10. It may require dealing with people, facts, figures, or abstract ideas at a high level of complexity. *Id.*

*available at* 2000 WL 1898704 at *3 (2000). Thus, the ALJ did not err by finding that claimant could still perform her prior work at SVP 7. (Tr. 28; tr. 65.)

## C.   Flawed VE Testimony

Finally, Zanders claims that the ALJ erred by relying upon flawed testimony from the Vocational Expert ("VE"). She contends that the ALJ failed to present a hypothetical that accurately described her mental limitations. He found that she had "moderate restrictions in concentration, persistence, or pace," but he did not include that limitation in the hypothetical to the VE.[17] (Doc. 12 at 16.)

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam). Here, claimant relies upon *Winschel v. Commissioner of Social Security*, 631 F.3d 1176 (11th Cir. 2011), which held that an ALJ could not rely upon a vocational

---

Unskilled work, on the other hand, requires little or no judgment, and provides no real work skills. *Id.*

[17] The Court declines plaintiff's attempt to relitigate the credibility and RFC weighing through the VE hypothetical. (Doc. 12 at 16.)

expert's assessment where that ALJ failed to pose a hypothetical question specifically accounting for claimant's "moderate limitation in maintaining concentration, persistence, and pace." *Id.* at 1181.

At a glance, then, *Winschel* appears to favor claimant. But *Winschel* also explained that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Id.* at 1180 (emphasis added), *citing Simila v. Astrue*, 573 F.3d 503, 521–22 (7th Cir. 2009), *Stubbs–Danielson v. Astrue*, 539 F.3d 1169, 1173–76 (9th Cir. 2008), and *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001). The ALJ in *Winschel* failed to indicate whether the claimant could perform simple, repetitive tasks or unskilled work. *Winschel*, 631 F.3d at 1181. Here, in contrast, the ALJ found that Zanders could perform not just simple, repetitive tasks, but some *skilled* work despite any deficiencies in maintaining concentration, persistence, or pace. (Tr. 24.) He posed the following hypothetical:

> This individual [will] be able to lift and carry at least 20 pounds occasionally, ten pounds frequently, be able to sit one to two hours

at a time, at least six hours total, walk and stand a total of four to six hours in a[n] eight hour work day with normal breaks. This individual would be able to do repetitive, short cycle and detailed work with no limitations. . . . So SVP-1 through 4. *Would be somewhat limited in performing complex work but could still perform it satisfactorily . . . including detailed work*. . . . . Will this individual be able to return to any of the past work performed by the claimant?

(Tr. 64-65 (emphasis added).)  The ALJ was not required to mention the limitations as to concentration, persistence or pace because he had already found that, despite the limitations, Zanders could perform skilled work.  Hence, the hypothetical was adequate under *Winschel*.

## III.  CONCLUSION

Based on the foregoing, the Commissioner's decision denying benefits should be **AFFIRMED**.

**SO REPORTED AND RECOMMENDED** this __12th__ day of August, 2013.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA